IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAVON ALBERTINI, | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  20-5765 |
| | : | |
| AESTHETIC PHYSICIANS, P.C., et al. | : | |

**<u>MEMORANDUM OPINION</u>**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    December 6, 2021

Presently before the Court is Defendants' Aesthetic Physicians, P.C. and Bodysculpt of

Philadelphia, LLC d/b/a "Sono Bello" (collectively "Defendant" or "Sono Bello")[1] Motion for

Summary Judgment. (Doc. 18.) Plaintiff Shavon Albertini ("Plaintiff" or "Albertini") brought this

action alleging acts of discrimination and retaliation related to an asserted unlawful termination of

her employment in violation of the Americans with Disabilities Act (ADA). (Doc. 1.) Plaintiff

filed a Response in Opposition to Defendants' Motion. (Doc. 20.)

---

[1] Although Aesthetic Physicians, P.C. is named as a party in this suit, Sono Bello claims that Aesthetic Physicians, P.C. has no employment relationship with the Plaintiff and therefore was improperly brought into this litigation. *See* (Doc. 18-2, at n.1.) Sono Bello reports that Plaintiff has "indicated her willingness to stipulate to Aesthetic Physicians, P.C.'s dismissal from this suit," but Plaintiff did not address this issue in her briefing. (*Id.*) Without Plaintiff's dismissal of Aesthetic Physicians, P.C. from suit, there are still two active defendants in the matter before us. That said, for the sake of uniformity, we will collectively refer to both parties throughout this opinion using the singular "Defendant" or "Sono Bello."

## I.   INTRODUCTION

Albertini contends that the termination by Sono Bello came after she disclosed to a supervisor that she had a medical history of bipolar disorder. After exhausting her administrative remedy, she then filed suit against Sono Bello under the ADA, alleging that she was discriminated and retaliated against based on her disability. Sono Bello now seeks summary judgment as to Albertini's claims. For the following reasons, the motion shall be denied.

## II.   BACKGROUND[2]

This case arises out of the termination of an employee with bipolar disorder, which occurred only hours after she disclosed her diagnosis to her employer and engaged in a heated exchange with her supervisor. Sono Bello is a medical practice consisting of plastic surgery and related cosmetic procedures. Albertini was hired on November 11, 2019 as a "Patient Experience Specialist." *See* (Doc. 18-2, *Def.'s Statement of Undisputed Facts* at ¶ 3); (Doc. 20-2, *Pl.'s Counterstatement of Material Facts* at ¶ 1.) Shortly after she was hired, Albertini began to have conflicts with a co-worker, Zoe Popowcer ("Popowcer"), who was also working as a "Patient Experience Specialist." *See* (Doc. 20-2 at ¶ 2.); (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 24:11-24.) Albertini and Popowcer had various disagreements related to their inability to decide on the distribution of their shared work responsibilities; Albertini's perception of Popowcer's condescending manner, including Popowcer's one-time reference to Albertini as "an intern;" and

---

[2] At the outset, we note that many of the facts in this case are in dispute, particularly those on the day of Albertini's termination. On summary judgment, our responsibility is to review the factual record in the light most favorable to the non-moving party and reserve any material disagreements for the factfinder. Especially when the record is made up of "he-said, she-said" statements, we emphasize that it is not our prerogative to assess the credibility of witnesses on summary judgment. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993) ("[A]t the summary judgment stage, a court is not to weigh the evidence or make credibility determinations…these tasks are left for the fact-finder.").

Popowcer's comments on Albertini's role as a single mother. *See* (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 51:10-53:21.) Albertini reported Popowcer's conduct to her then-supervisor Manager Lindsay Marshall ("Marshall") around December 2019. (*Id*. at 55:6-17, 57:4-58:15.) At that time, the Sono Bello branch at which Albertini and Popowcer worked was without a local manager, and Marshall served as that location's interim "direct supervisor." (*Id*. at 56:4-15.) Marshall attempted to mediate their issues and come to a resolution. (*Id*.) It appears that Marshall's efforts did not succeed, as problems between Popowcer and Albertini continued, with Albertini making further verbal complaints to various persons in Sono Bello management about Popowcer's conduct. (*Id*. at 59:17-60:7.)

On January 28, 2020, Sono Bello's Vice President of Operations, Lindsey Wyatt ("Wyatt") traveled from Sono Bello's headquarters in Texas to Pennsylvania to address operational problems at the business location where Plaintiff worked.[3] *See* (Doc. 18-2 at ¶ 4). Wyatt held supervisory authority over Marshall, as well as Albertini and Popowcer, and possessed the capacity to hire and fire Sono Bello employees. *See* (Doc. 20-2 at ¶ 6); (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 17:19-23.) On that same day, soon after Wyatt's arrival, Albertini approached Wyatt to express that she was having interpersonal issues with Popowcer and requested Wyatt's help in resolving them. (Doc. 18-2 at ¶ 5.) On January 29, 2020, Albertini, Popowcer, and Wyatt were working late together in the office. (*Id*. at ¶ 6.) As they were closing the office, Popowcer told Albertini that she suffered from attention deficient hyperactivity disorder (ADHD), and in response, Albertini shared that she had been diagnosed with bipolar disorder. (*Id*. at ¶¶ 7-10.) Wyatt came out of her office and joined

---

[3] Wyatt testified at her deposition that the purpose of her trip was a "check-up," as Albertini's location was without a manager and "had a lot of newer staffing." (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 68:1-15.) She clarified that she did not travel to Pennsylvania due to any specific issues between Albertini and Popowcer. (*Id*.)

their conversation, at which time Plaintiff also informed Wyatt that she has bipolar disorder.[4] (*Id.* at ¶¶ 11-12.) In response, Wyatt became emotional and told Albertini that she could relate to the struggles faced by people with bipolar disorder because her teenage daughter suffers from the same disorder. (*Id.* at ¶ 13.)

Albertini stated that she and Wyatt discussed her "journey with bipolar disorder and her experience with various medications she has taken or currently takes to manage the condition." (Doc. 20-2 at ¶ 19.) Additionally, Wyatt testified at her deposition that she had a specific recollection of Plaintiff explaining that her bipolar disorder caused her stress and anxiety, which required her to take "mental breaks" during the day. (*Id.* at ¶ 22) (citing Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 78:6-12, 75:19-80:20). In response, Wyatt encouraged Albertini to take breaks if she ever felt overwhelmed or exhausted at work. (*Id.* at ¶ 23) (citing Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 82:15-83:3.) In the same conversation, Albertini expressed to Wyatt that the word "crazy" was a "trigger" for her, and that she was worried that she would be treated differently at work if people knew that she had bipolar disorder. (*Id.* at ¶¶ 32-33) (citing Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 110:5-111:16, 82:3-14.) After work, Wyatt invited both Albertini and Popowcer to dinner that evening. *See* (Doc. 18-2 at ¶ 14.) During dinner, Wyatt openly shared her teenage daughter's struggles with bipolar disorder, and in return, Plaintiff shared her experience with bipolar disorder as a teen and young

---

[4] This version of events is recounted in "Defendant's Statement of Undisputed Facts" (Doc. 18-2) and admitted in full in "Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts" (Doc. 20-3.) Thus, we accept it for purposes of resolving this motion. We note, however, that Wyatt testified to a slightly different version of events during her deposition, where she stated that Albertini first disclosed her bipolar diagnosis during their January 28, 2020 conversation when Albertini complained of Popowcer's conduct. (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 75:19-77:20.) Wyatt also testified that she shared her daughter's diagnosis in that same conversation. (*Id.* at 77:21-24.) In any event, we do not dispute the parties' agreement as to these facts. We merely note that the record reflects that Wyatt learned of Albertini's diagnosis no earlier than January 28, 2020 and no later than January 29, 2020.

adult. (*Id*. at ¶ 15.) The next day, January 30, 2020, Albertini and Popowcer worked the entire day together without issue; Albertini "genuinely believed" that, with Wyatt's help, they had resolved their differences. (*Id*. at ¶ 16.)

On January 31, 2020, Albertini and Popowcer continued to have disagreements about the delegation of their shared tasks. (*Id*. at ¶ 17.) Plaintiff asked to speak to Wyatt about Popowcer's conduct. (*Id*. at ¶ 18.) During their meeting, Wyatt informed Plaintiff that no other employees had complained about Popowcer, and that being the only one with so many complaints against Popowcer made Albertini "look like a crazy person."[5] (*Id*. at ¶¶ 19-21.) Albertini began to have a panic attack in front of Wyatt, and asked Wyatt "about three or four times" to confirm that she had just used the word "crazy" to describe Albertini. (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 82:16-83:8.) Plaintiff then asked to go home for the day, which Wyatt permitted.[6] Albertini returned to the front desk to collect her things, when she and Popowcer engaged in a verbal altercation. (Doc. 18-2 at ¶ 24.) Wyatt asked Plaintiff and Popowcer to go into a lounge in the back of the office rather than argue at the front desk. (*Id*. at ¶ 25.) The argument continued in the lounge, until Plaintiff turned

---

[5] Again, both parties have agreed in "Defendant's Statement of Undisputed Facts" (Doc. 18-2) and "Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts" (Doc. 20-3) that Wyatt made this statement to Albertini. We do not dispute these agreed-upon facts and review the record in the light most favorable to Plaintiff as the non-moving party. We note, however, that Wyatt denied ever telling Albertini that she was "acting like" or "looked like" a crazy person in her deposition. (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 109:17-20.)

[6] Wyatt's recollection of this interaction varied significantly. Wyatt recounted that Albertini was "very upset" when she came into Wyatt's office and "a level 12 out of 10." (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 110:1-24.) Wyatt said that Albertini repeatedly said, "You're making me look crazy, you think I'm crazy, all of you all are trying to make me look crazy[.]" (*Id*.) Wyatt claims that while she never used the word "crazy," Albertini "used the word crazy no less than 100 times…and just [kept] yelling that [Popowcer] was this person that we didn't know." (*Id*.) Wyatt also claims that Albertini was "screaming" and so incoherent that "I literally kept telling her, I cannot understand the words coming out of your mouth." (*Id*.) Wyatt then said that she told Albertini, "I think its best if you go home[.]" (*Id*. at 111:9-10.)

to Wyatt and said, "Good luck with your daughter, you don't listen."[7] (*Id*. at ¶ 26); (Doc. 20-4, Pl. Ex. 1, Albertini Dep., 88:16-89:4). At that point, after Albertini made the comment about Wyatt's daughter, Wyatt stated, "Goodbye, I'm done" and escorted her out of the building. (Doc. 18-2 at ¶ 27.) When Plaintiff was leaving, Wyatt demanded that she hand over her keys to the office. (*Id*. at ¶ 28.) Wyatt acknowledged that Albertini never said the words "I quit," and that by taking Albertini's keys, Wyatt "effectively terminated" Albertini's employment. (Doc. 20-4, Pl. Ex. 2., Wyatt Dep. 128:9-19.)

After Albertini left, Wyatt contacted Human Resources and recounted the incident to a representative. (*Id*. at 129:18-22.) Wyatt did not inform Human Resources that she had terminated Albertini. (*Id*. at 129:23-130:1.) The next day, on February 1, 2020, Wyatt was presented with paperwork to fill out regarding Albertini's employment status and elected to categorize Albertini's dismissal as "job abandonment," as Albertini did not come to work that day and "didn't call anybody or follow up" after the incident. (*Id*. at 130:10-24); (Doc. 20-2 at ¶¶ 49-50.) Albertini stated that although she was scheduled to work the following day, she couldn't go to work due to Wyatt's confiscation of her key. (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 95:23-96:9.) Albertini testified that "[I] assumed that I was terminated because of my comments and my disorder." (*Id*.) On February 3, 2020, Sono Bello's Chief Human Resources Officer contacted Wyatt to clarify whether Plaintiff was terminated or had resigned, to which Wyatt responded: "She walked out." (Doc. 20-2 at ¶ 51.) On February 11, 2020, almost two weeks after she was terminated, Albertini contacted Sono Bello's Human Resources regarding her employment status and was told that she "voluntarily ended" her employment. (*Id*. at ¶¶ 52-53.) At that point, Albertini informed Human

---

[7] As discussed below, Wyatt contends that Albertini did not make this particular statement, but instead said: "[N]o wonder your daughter is fucking crazy, she has a fucking bitch of a mom like you, no wonder she's fucking crazy." (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 113:10-12.)

Resources that Wyatt had terminated her employment by taking her keys, and her employment status was subsequently changed to "Involuntary," with a box checked for "Misconduct." (*Id*. at ¶¶ 54-55.); (Doc. 20-4, Pl. Ex. 7.)

Plaintiff has exhausted her administrative remedies by dual filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").[8] *See* (Doc. 1 at ¶ 4.) On November 18, 2020, Plaintiff timely filed this suit against Sono Bello upon the issuance of a Notice of Right to Sue by the EEOC. (*Id*.) On September 8, 2021, Sono Bello filed this motion for summary judgment, seeking dismissal of Albertini's case on the basis that she has not adequately proven that her termination was discriminatory or retaliatory .

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In evaluating a summary judgment motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [its] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). "The non-moving party

---

[8] Plaintiff indicated in her Complaint that her claims under the Pennsylvania Human Relations Act ("PHRA") were still pending before the Pennsylvania Human Relations Commission ("PHRC") at the time she filed suit in November 2020. *See* (Doc. 1 at ¶ 15.)

has the burden of producing evidence to establish by prima facie each element of its claim." *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986)). In turn, "the moving party need only show that the non-moving party 'has failed to produce evidence sufficient to establish the existence of an element essential to its case' in order to obtain summary judgment." *A. Natterman & Cie GmbH v. Bayer Corp.*, 428 F. Supp. 2d 253, 257 (E.D. Pa. 2006) (quoting *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir. 1994)).

## IV.   DISCUSSION

In light of the record discussed above, Albertini asserts her termination was both discriminatory and retaliatory in violation of the ADA, and that she is entitled to recovery from Sono Bello for its unlawful and discriminatory employment practices. In response, Sono Bello contends that Albertini has failed to prove a *prima facie* case of discrimination, as she cannot point to any causal connection between her supervisor's use of the word "crazy" and her termination. Moreover, Sono Bello asserts that in the event the Court finds that Albertini has proven a *prima facie* case, she has failed to provide evidence that could overcome the legitimate, nondiscriminatory reason that Sono Bello produced to explain Albertini's termination. In other words, even if Albertini can sufficiently prove the elements required for a discrimination claim, her claim alternatively fails because she has not demonstrated that Sono Bello's proffered reason is pretextual. As to Albertini's retaliation claim, Sono Bello argues that the temporal proximity of any protected activity and Albertini's termination is not sufficient, standing alone, to establish the necessary causal relationship to support her allegations.

We first discuss Albertini's claims related to discrimination and whether she has overcome the requisite burdens set forth by the framework established in *McDonnell-Douglas Corp. v.*

*Green,* 411 U.S. 792 (1973). Next, we review Albertini's claims of retaliation and whether she has demonstrated the necessary causal relationship between her protected activity and the alleged adverse employment action she suffered.

### A.  Discrimination Claim

At the outset, Sono Bello asserts that "[t]hroughout extensive discovery and depositions, Plaintiff has yet to produce sufficient facts to establish her claim for discrimination." (Doc. 18-1, Def. Br. at 4.) In Sono Bello's view, Albertini's "entire case rests on Wyatt's single comment that being the only one with issues against Popowcer makes Plaintiff 'look like a crazy person.'" (*Id.*) According to Sono Bello, Albertini has yet to offer any evidence that the "colloquial" use of the word "crazy" was in reference to her bipolar disorder, let alone connected to Sono Bello's decision to terminate her. (*Id.*) Sono Bello argues that Albertini's failure to demonstrate this connection defeats her discrimination claim in two ways: first, she cannot prove a *prima facie* case for discrimination without causation, and second, even in the event that Albertini has established a *prima facie* case, she has not overcome her burden in demonstrating that Sono Bello's proffered legitimate nondiscriminatory reason is pretextual. (*Id.* at 3-5.) In response, Albertini contends that she has adduced circumstantial evidence from which a fact finder could reasonably conclude that the adverse employment action she suffered was the result of discrimination. *See* (Doc. 20-1, Pl. Br. at 4-6.) Additionally, Albertini claims that Sono Bello's articulated legitimate nondiscriminatory reason for her termination is insufficient, and that the circumstances surrounding her termination demonstrate that any reason proffered by Sono Bello is "merely pretext." (*Id.* at 6-10.)

In assessing claims of discrimination based on a disability under the ADA, we apply the three-step burden-shifting framework set out by the United States Supreme Court in *McDonnell-*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must demonstrate a *prima facie* case of discrimination. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). Next, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id*. Finally, if the defendant carries this burden by producing such a reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the defendant was pretextual. *Id*. at 500-01. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.1999) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)). Below, we set out a discussion of each step of the burden-shifting analysis as they apply to Albertini's claims regarding Sono Bello's alleged discrimination.

### i. Albertini's *Prima Facie* Case

To survive a summary judgment motion, the plaintiff's evidence must be sufficient to convince a reasonable fact finder to find all of the elements of the *prima facie* case. *See Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 491 (E.D. Pa. 2010) (quoting *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). A *prima facie* case of disparate treatment by an employer due to a disability requires Albertini to prove that (1) she is a disabled person within the meaning of the ADA; (2) she is a qualified individual that can perform the essential functions of her job with or without reasonable accommodation; and (3) she suffered an adverse employment action as a result of discrimination.[9] *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d

---

[9] We note that the only the third element of Albertini's *prima facie* case is challenged by Sono Bello on summary judgment. As there is no stated dispute on the record regarding the other two elements, we accept them as established for purposes of resolving Allstate's motion. *See* (Doc. 20-1 at 4) ("Defendant does not argue that Plaintiff was not disabled, or unable to perform the essential functions of her job with or without reasonable accommodations."); *see also Taylor*, 184 F.3d at

296, 306 (3d Cir. 1999). As to the third and final element, a plaintiff "must provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action." *Mengel v. Reading Eagle Co*., No. CIV.A. 11-6151, 2013 WL 1285477, at *4 (E.D. Pa. Mar. 29, 2013) (holding that an ADA discrimination claim could not survive summary judgment where the plaintiff had not produced evidence of "a causal link" between her alleged disabilities and her termination). In general, "the burden of establishing a prima facie case of disparate treatment is not onerous." *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (quoting *Anderson v. Wachovia Mortg. Corp*., 621, F.3d 261, 271 (3d Cir. 2010) (internal quotation marks omitted).

Sono Bello claims that Albertini has failed to demonstrate how her bipolar disorder was causally connected to the adverse employment action she suffered. Sono Bello does not dispute that Wyatt used the word "crazy" in conversation with Plaintiff immediately before her termination, but argues that "Plaintiff has not offered any evidence to substantiate that a colloquial use of the word 'crazy' was in reference to Plaintiff's bipolar disorder, or more notably, that would link this remark to Sono Bello's decision to terminate her." (Doc. 18-1 at 4.) Defendant cites *Scott v. Allied Waste Servs. of Bucks-Mont,* No. CIV.A. 10-105, 2010 WL 5257643, (E.D. Pa. Dec. 23, 2010) (Schiller, J.), *aff'd*, 448 F. App'x 306 (3d Cir. 2011) in support of their contention that the mere use of the word "crazy" is not sufficient to prove causation in a plaintiff's *prima facie* case. *See* (Doc. 18-1 at 4-5). In *Scott*, an employee brought a claim under the ADA contending that he was unlawfully terminated because he was regarded as having a mental disability. *See* No. CIV.A. 10-105, 2010 WL 5257643 at *3. The plaintiff in that case pointed to remarks made by his co-

---

309 (holding that a plaintiff who was diagnosed with bipolar disorder was "disabled" under the ADA, as bipolar disorder was a mental impairment that substantially limited the plaintiff's ability to think).

workers about his "animated" and "nervous, twitchy disposition," where they had referred to him as "crazy," "loco," or "a wacko." *Id*. at *2. In response, the employer claimed that the plaintiff was terminated after incurring multiple disciplinary violations for "unexcused and excessive absences and tardiness," which culminated in his apparent job abandonment after he left his place of employment without explanation to his superiors. *Id*. at *2-3. Ultimately, the court granted summary judgment for the employer, explaining that, "[w]hile [the plaintiff] has offered evidence that various co-workers and supervisors made comments to the effect that he was "crazy," [the plaintiff] has not offered any evidence tending to link these remarks to the decision to terminate him." *Id*. at *5.

Although we appreciate Sono Bello's argument in citing *Scott* for the proposition that the mere utterance of the word "crazy" may not be sufficient to establish causation, we also take into account another precedent from this court, *Decker v. Alliant Techs.*, *LLC*, 871 F. Supp. 2d 413 (E.D. Pa. 2012) (Pratter, J.). In *Decker*, an employee brought an ADA claim for wrongful termination based on his disability, specifically, his ADHD and bipolar disorder. *Id*. at 418. The plaintiff disclosed his medical conditions to his supervisor and explained that they may have adversely affected his past job performance. *Id*. at 419. After the employer had been made aware of his disability, but seeing no improvement in the plaintiff's sales, he was terminated—though it was unclear when the termination would take effect. *Id*. at 420-21. In a conversation with the employer's president, the plaintiff was told that he needed to get his "head screwed on straight" and that his "disease" or "ailment" may be the source of his misunderstanding as to his employment status. *Id*. at 422. The president had learned of the plaintiff's mental disability that same week, and the plaintiff was formally terminated shortly after this conversation. *Id*. at 422-23. In response to the lawsuit, the employer claimed that the president's comment was "colloquial" and there was no

evidence to suggest it was made in reference to the plaintiff's ADHD or bipolar disorder. *Id.* at 422. The court disagreed, holding that a reasonable trier of fact could find sufficient "causation" for the plaintiff's *prima facie* case, due to the fact that plaintiff was officially terminated shortly after his conversation with the president, and that the president was the senior-most individual who was involved in that decision. *Id.* at 428-29. In short, the court explained that, "this is *not*, as [the employer] contends, a scenario where a plaintiff can only show an employer's mere awareness of a disability absent any other appropriate evidence to connect the disability to the adverse employment decision." *Id.* at 428 (emphasis added).

We believe *Decker* is more instructive in our consideration of this case than *Scott.*[10] As the court stated in *Decker*, "the close temporal proximity" of the events leading up to Albertini's termination could give rise to a reasonable inference by a trier of fact that the adverse employment action was causally connected to the disclosure of her bipolar disorder. *Id.* at 429. Albertini disclosed her diagnosis to Wyatt, her supervisor, only 36 hours before her termination. (Doc. 20-2 at ¶¶ 16-24.) In the course of that disclosure, Wyatt was made personally aware of the extent of Albertini's bipolar disorder, including her past and current medications, as well as her "triggers." (*Id.* at ¶¶ 19, 32.) When the conversation turned to the fact that Wyatt's daughter suffers from

---

[10] Sono Bello cites *Scott* in support of its argument that Albertini failed to prove causation as it relates to her *prima facie* case, as well as in support of its argument that Albertini failed to demonstrate that Sono Bello's proffered legitimate nondiscriminatory reason is merely pretextual. *See* (Doc. 18-1 at 4-5.) In *Scott*, however, the court assumed *arguendo* that the plaintiff had proven his *prima facie* case and made no conclusion as to causation as it relates to the first step of the *McDonnell-Douglas* framework. *See* No. CIV.A. 10-105, 2010 WL 5257643, at *4 ("[T]he Court will assume [the plaintiff] has made out a prima facie case. Nonetheless, [the plaintiff] has failed to carry his burden to show that [the employer's] proffered reasons for his termination were pretextual."). Thus, any analysis as to causation in *Scott* is relevant only to our discussion of pretext, *see infra* Section IV.A.iii, and does not bear on our discussion of Albertini's *prima facie* case. Additionally, we find *Scott* factually distinguishable for same reasons set out in Plaintiff's response briefing. *See* (Doc. 20-1 at 6.)

bipolar disorder, Albertini specifically told Wyatt that the use of the word "crazy" was a trigger for her, due to the "stigma" associated with the diagnosis. (*Id*. at ¶ 32); (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 110:5-111:16, 112:8-19.) Less than two days later, when Albertini approached Wyatt with another complaint against Popowcer, Wyatt told her, "[N]o one else has come to me about Ms. Popowcer [sic], so you look like the crazy person." (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 81:23-24.) Albertini then asked Wyatt to confirm her statement, "I said to [Wyatt] 'Are you calling me crazy knowing that I just shared my diagnosis with you?' And [Wyatt's] response was the same, with crossed arms and the head nod." (*Id*. at 82:16-83:8.) According to Albertini, Wyatt had been more receptive to her complaints about Popowcer before she had disclosed her diagnosis: "[Wyatt] started to treat me like the source of the problems between me and Popowcer only after I disclosed to her that I was diagnosed with bipolar disorder." (Doc. 20-4, Pl. Ex. 3 at ¶ 7.) Less than 30 minutes later, Albertini was terminated. *See* (Doc. 20-2 at ¶ 44.)

Viewing the facts presented in the light most favorable to Albertini, we conclude that she has adduced sufficient circumstantial evidence from which a jury could reasonably conclude that there was a causal relationship between the disclosure and her termination. As in *Decker*, there was a close temporal proximity between when Albertini's supervisor learned of her disability, when the "crazy" comment was made, and when Albertini was terminated. Furthermore, the decision to terminate Albertini was unilaterally made by Wyatt, a senior member within Sono Bello's corporate structure who had intimate knowledge of Albertini's diagnosis. Similar to the defense put forward by the employer in *Decker*, Sono Bello contends that Wyatt's use of the word "crazy" was merely "colloquial," but Albertini testified at her deposition that she "knew [Wyatt] was referencing my bipolar disorder…because I asked her to confirm her statement and she did." (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 81:4-82:6.) Although the record certainly contains credible

evidence that could support a contrary inference, which we discuss further below, these facts should be heard and determined by a jury or other factfinder. We conclude that Albertini's claim of discrimination survives the motion for summary judgment, given that she has presented some evidence of her *prima facie* case, including causation.

### ii.  Sono Bello's Legitimate Nondiscriminatory Reason

After the plaintiff has provided proof of its *prima facie* case, the burden shifts to the defendant to produce a justification for the adverse employment action. The defendant's burden at this stage is "relatively light" and is satisfied if the employer produces evidence, "which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). That is, "the defendant need not prove that the articulated reason actually motivated the action." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)) (internal quotations omitted). Whether the defendant has met its burden of production is a determination for the court and "involves no assessment of credibility." *Johnson v. Women's Christian All.*, 76 F. Supp. 2d 582, 586 (E.D. Pa. 1999) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, (1993) ("The burden-of-production determination necessarily *precedes* the credibility-assessment stage.")).

Sono Bello insists that "both parties are in agreement that Plaintiff was terminated after stating to Wyatt, 'Good luck with your daughter,' in reference to Wyatt's daughter's bipolar disorder." (Doc. 18-1 at 5.) That is, Sono Bello asserts that the legitimate, nondiscriminatory reason for Wyatt's decision to termination Plaintiff's employment was her insubordination in making an offensive comment. Albertini disagrees, claiming that Sono Bello cannot rely on this comment to satisfy its burden of production, in that Wyatt testified at her deposition that Albertini

never made such a comment.[11] (Doc. 20-1 at 7.) According to Albertini, she could not have been fired for a statement that she did not make, and Wyatt did not hear. (*Id*.) The problem with this assertion is that Albertini's own testimony conflicts with her stated argument. In her deposition, Albertini admitted that just moments before she was fired, she said to Wyatt: "'Good luck with your daughter because you don't listen'…I felt like she was being insensitive towards the [bipolar] disorder, and basically, discriminating against the disorder[.]" (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 88:16-89:4.)[12] Although Albertini accurately notes in her briefing that "Wyatt testified unequivocally that Plaintiff did not make that comment to her" (Doc. 20-1 at 7), Wyatt also testified that Albertini stated, "[N]o wonder your daughter's fucking crazy, she has a bitch of a mom like you." (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 127:18-128:2).[13] According to Wyatt, it was at that point that she said to Albertini, "enough, we're done" and directed her out the door. (*Id*.)

It is not our role at the summary judgment stage to make a credibility assessment as to what Albertini did or did not say; rather, it is the province of a factfinder at trial to consider the conflicting testimony of Albertini and Wyatt to make such a determination. The record reflects that there is an outstanding question as to the *exact* comment that motivated Wyatt to fire Albertini. At present, however, we must only determine if Sono Bello has produced some legitimate justification for the adverse employment action. Even viewing the record in the light most

---

[11] Albertini also denies that she ever acknowledged that she was terminated "solely" because of any comment to Wyatt. (Doc. 20-3 at ¶ 29.) Albertini points to her deposition, where she testified as follows: "I only assumed that I was terminated because of my comments *and my disorder*." (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 95:23-96:9) (emphasis added).

[12] In "Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts," Albertini conceded that she made this comment: "It is admitted that Plaintiff said to Wyatt, 'good luck with your daughter, you don't listen.'" (Doc. 20-3 at ¶ 26.) Although Albertini denied that she was referencing Wyatt's daughter's bipolar disorder in making the comment, her deposition testimony we have recounted above may suggest otherwise. (*Id*.)

[13] Plaintiff denies making this comment to Wyatt. (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 94:1-3.)

favorable to Albertini, we cannot pretend that Sono Bello has failed to produce evidence that Albertini made a comment to Wyatt which may have warranted termination. The precise nature of that comment is disputed, to be sure, but both Albertini and Wyatt testified that a heated exchange occurred just moments before Albertini's termination, and that Albertini made certain unwelcome reference to Wyatt's daughter's bipolar disorder in the course of that exchange. *See generally* (Doc. 20-4, Pl. Ex. 1, Albertini Dep. 81:1-89:4.) ; (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 110:10-126:21.) We conclude that Sono Bello has satisfied its "relatively light" burden in producing a legitimate nondiscriminatory reason, and adequately articulated that Albertini's dismissal was due to an undesirable comment Albertini made to her supervisor about her daughter's mental illness.

### iii.  Pretext

Once the employer articulates a legitimate reason for the unfavorable employment decision, the burden of production "rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes*, 32 F.3d at 763. A plaintiff can show pretext, and so defeat a motion for summary judgment, "by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Decker*, 871 F. Supp. 2d at 429 (quoting *Fuentes*, 32 F.3d at 764) (emphasis in original). Albertini appears to proceed as to the first method of demonstrating pretext. Under this approach, "the plaintiff's evidence rebutting the employer's proffered legitimate reason must allow a factfinder reasonably to infer that the employer's proffered non-discriminatory reason was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id*. This can be accomplished by "demonstrating such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id*. (internal citation omitted). Further, the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id*. (internal citation omitted).

Albertini points to several aspects of the record that cast doubt on Sono Bello's articulated reason for her termination.[14] Specifically, Plaintiff notes that Wyatt never documented any of Plaintiff's comments that were allegedly the basis for her termination, nor did anyone else from Sono Bello. *See* (Doc. 20-1 at 9-10.) According to Albertini, if the true reason for her dismissal was a comment about Wyatt's daughter, and not her bipolar disorder, then Sono Bello "had every incentive to simply document that Plaintiff was terminated for that reason." (*Id*.) Evidently there was a lack of clarity as to why Albertini became separated from her job, as she was never informed of the reason for her termination and later produced evidence during discovery that showed that Sono Bello attempted to characterize her dismissal as "voluntary." (*Id*.) During her deposition, Wyatt testified that her actions in taking Albertini's keys were intended to prevent her from returning to work and effectively terminated Albertini's employment. (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 128:3-19.) After the incident, however, Wyatt subsequently contacted Human Resources to

---

[14] In support of her argument as to pretext, Albertini again points to Wyatt deposition testimony in which she stated she never heard Albertini make the "Good luck with your daughter" comment. *See* (Doc. 20-1 at 9.) Albertini admitted in her own deposition that she made the "Good luck with your daughter" comment. Furthermore, although Wyatt testified that she did not hear Albertini make that *specific* comment, she claims that Albertini instead made a different comment in reference to her daughter's bipolar disorder. For these reasons, we will not consider Albertini's argument that Sono Bello's proffered legitimate, nondiscriminatory reason must be pretextual because it was based on comment of which Wyatt "was not aware." (*Id*.) It is apparent from the record that Wyatt heard *some* comment which Sono Bello alleges motivated her decision to terminate Albertini's employment. We will, however, consider Albertini's remaining arguments.

let them know what had happened but did not tell them that she had terminated Albertini's employment. (*Id*. at 129:18-130:6.) The next day, Sono Bello categorized Albertini's termination as "job abandonment," stating that "she [Albertini] resigned without notice yesterday, keys collected." (Doc. 20-4, Pl. Ex. 4., Pl. Ex. 5.) When Human Resources sought clarification from Wyatt as to whether Albertini resigned or was fired, Wyatt simply stated: "She [Albertini] walked out." (Doc. 20-4, Pl. Ex. 4.) Almost two weeks after she was dismissed, Albertini called Sono Bello's Human Resources to inquire as to her job status and explained that she did not quit or abandon her job, at which point her separation from employment was categorized as "involuntary." (Doc. 20-4, Pl. Ex. 3 at ¶¶ 10-11); (Doc. 20-4, Pl. Ex. 7.)

Sono Bello relies again on *Scott v. Allied Waste Servs. of Bucks-Mont*, No. CIV.A. 10-105, 2010 WL 5257643, (E.D. Pa. Dec. 23, 2010), *aff'd*, 448 F. App'x 306 (3d Cir. 2011) in support of its contention that Albertini has failed to provide sufficient evidence from which a factfinder could disbelieve Sono Bello's stated reason for her termination. In citing *Scott*, Sono Bello argues that Wyatt's mere use of the word "crazy," alone, cannot support a finding of pretext. *Id*. at *5. We agree with this proposition from *Scott*, but it is not applicable here. Albertini does not rely solely on Wyatt's use of the word "crazy" to demonstrate that Wyatt may have had an unlawful motivation in terminating her. Rather, Albertini claims that a "reasonable jury considering the evidence surrounding Defendant's actions…could easily conclude that the Defendant tried to obfuscate the true reasons [behind Plaintiff's termination.]" (Doc. 20-1 at 9.) In our view, Sono Bello's actions following Albertini's termination could support a finding that Sono Bello's proffered reason for the employment action is pretextual, especially when coupled with the fact that Wyatt admitted that Plaintiff did not quit, and that Plaintiff did not have any prior disciplinary history before this incident. *See* (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 128:3-19, 134:2-12.) In our

view, a factfinder could also disbelieve Sono Bello's articulated reason for terminating Albertini by simply considering other facts from the record that were previously discussed in relation to Albertini's *prima facie* case, particularly the temporal proximity of the Albertini's bipolar disorder disclosure and her subsequent firing.

We acknowledge that aspects of the record could support the proposition that Albertini's inflammatory comment about Wyatt's daughter was the true reason for her dismissal. Nonetheless, we must review the record in the light most favorable to Albertini as the non-movant. We conclude that the conflicting testimony of the parties creates a genuine issue of fact regarding whether she was terminated for a legitimate reason, or whether that reason was merely pretext for discrimination based on her bipolar disorder.  Accordingly, the Court denies Sono Bello's motion for summary judgment as to the ADA discrimination claim.

### B.  Retaliation Claim

Sono Bello alleges that in addition to Albertini's failed discrimination claim, Albertini has also "failed to meet her burden to show causation as required for a retaliation claim." (Doc. 18-1 at 5.) Specifically, Sono Bello asserts that in the context of a retaliation claim, temporal proximity itself does not sufficiently demonstrate causation, and that Albertini must do more than show that her "protected activity" under the ADA was close in time to the adverse action she suffered. (*Id*.) In response, Albertini counters that it is "well-established" in the Third Circuit that temporal proximity alone is sufficient to establish causation, where the temporal proximity is unusually suggestive of retaliatory motive. (Doc 20-1 at 11.) In light of these conflicting views, we address at the outset the parties' disagreement about the legal standard in our Circuit as to causation in a retaliation claim. We then turn to the substance of their respective arguments to determine if Albertini's claim survives summary judgment.

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[15] *Shaner*, 204 F.3d at 500 (internal citation omitted). Notably, the burden-shifting framework from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) also applies to ADA retaliation claims. *Id*. Therefore, if the plaintiff can establish the elements of her *prima facie* case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Shellenberger*, 318 F.3d at 187 (internal citation omitted). If the employer satisfies that burden, the plaintiff must then prove that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Id.* (internal citation omitted).

The Third Circuit has held in the ADA retaliation context that "[t]he amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation." *Id.* at 189. Specifically, the Third Circuit has "indicated that temporal proximity between the employee's protected activity and the alleged retaliatory action *may* satisfy the causal link element of a *prima facie* retaliation claim, at least where the timing is '*unusually suggestive of retaliatory motive*.'" *Shaner*, 204 F.3d at 505 (citing *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 503 (3d Cir. 1997))

---

[15] Defendant did not challenge any other element of Plaintiff's retaliation claim other than causation. *See* (Doc. 18-1 at 5.) For purposes of this motion, we too will assume *arguendo* that Plaintiff's actions in opposition to Wyatt's allegedly discriminatory comment about Albertini "acting like a crazy person" constitute "protected activity" under the ADA. Namely, Albertini claims that her "protected activity" includes voicing her opposition to Wyatt's use of the word "crazy," specifically asking her, "Did you call me crazy?" (*Id*.); *see also* (Doc. 1 at ¶ 87.) There is no dispute between the parties that Albertini's termination constitutes an "adverse employment action" as required for a retaliation claim.

(emphasis added). Historically, the Third Circuit has held that two days, and even as many as ten days, between the protected activity and the alleged retaliation is "unusually suggestive" enough to support an inference of a causal connection. *See Shellenberger*, 318 F.3d at 189; *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). It is only "where the temporal proximity is *not* so close as to be unduly suggestive," that the Third Circuit has required additional evidence to establish causation. *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (internal citation omitted).

Having determined the appropriate standard that governs our review, we turn to the present matter. Here, Albertini correctly cites the Third Circuit standard for causation as it applies to retaliation claims with an "unusually suggestive" temporal proximity between the protected activity and the adverse action. In accordance with that standard, she alleges that "the entirety of Plaintiff's interaction with Wyatt in the less than 30 minutes preceding her termination revolved around Plaintiff's opposition to Wyatt's discriminatory comment comparing Plaintiff to 'a crazy person.'" (Doc. 20-1 at 11.) In our view, and as the Third Circuit has stated, the brevity of this time period could give rise to a reasonable inference of retaliatory motive as it relates to causation. Historically, time periods as long as ten days have been sufficiently short to establish this inference; we cannot imagine that the passage of 30 minutes would not satisfy the Third Circuit's requirement that the temporal proximity between the protected activity and the adverse action be "unusually suggestive." A factfinder could very well conclude that Albertini has established a *prima facie* case of retaliation, as she was fired about a half hour after engaging in "protected activity," namely, after she challenged Wyatt about her use of the word "crazy" in possible reference to her bipolar disorder.

In response, Sono Bello claims again that Albertini's comment about Wyatt's daughter was the "motivating factor" behind her dismissal, and not due to any protected activity. (Doc. 18-1 at 6). We accept that Sono Bello has met its burden in producing a legitimate, nonretaliatory reason for the adverse employment action. Shifting the burden back to Plaintiff to demonstrate pretext, Albertini "incorporates by reference her pretext argument" from her discrimination claim. (Doc. 20-1 at 11.) Albertini previously argued that the lack of documentation surrounding her termination, including Wyatt's numerous inaccurate statements to Sono Bello about the circumstances that led to Albertini's dismissal, gives rise to an inference of discrimination. We think the same evidence could give rise to an inference of retaliatory animus in Wyatt's decisionmaking process. A reasonable factfinder could conclude that Albertini's protected activity—namely, her loud, public, and continuous questioning of Wyatt's use of the word "crazy"—could have motivated her to terminate Albertini. *See* (Doc. 20-4, Pl. Ex. 1, Albertini Dep., 87:7-16) ("So I asked the same questions again, 'You just called me a crazy person, right, after I told you about my disorder?' And then she admitted yes. Her response was consistent throughout…[until we went into the lounge, and Wyatt said] 'That didn't happen. What are you talking about?'"); (Doc. 20-4, Pl. Ex. 2, Wyatt Dep. 113:12) ("And [Albertini's] screaming. Everyone in the facility, patients, doctors, everyone can hear her."). Viewing the record in the light most favorable to Albertini, a jury could find that Wyatt's unwillingness to acknowledge that Albertini was terminated after their argument, and the lack of explanation as to her dismissal, were attempts by the Defendant to "obfuscate" any potential retaliatory animus behind her termination.

We conclude that there is enough evidence to create a genuine issue of fact as to whether Albertini was terminated for a legitimate reason, or whether that reason was retaliatory.

Accordingly, the Court denies Sono Bello's motion for summary judgment as to the ADA retaliation claim.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is denied. An appropriate Order follows.